Good morning, Your Honors. Good morning, Counsel. My name is Mark Wilson. I'm counsel for Michael Malone. This is an action that Mr. Malone brought to recover damages sustained from his investment in an investment program called the Common Trust Fund, which was marketed in Washington by the defendant, Multinational Strategies, and its other entities. Multinational Strategies sent Mr. Malone its private offering memorandum in Washington. There was represented to Mr. Malone a potential for profit and that it was a legitimate tax shelter based upon a $15.6 million loan originating from the defendant, HVB, or Hypovariance Bank. Mr. Malone invested in the Common Trust Fund, was supposed to invest in foreign currency options with gains allocated to the charitable trusts and losses allocated to the investors on a pro rata basis. Enterprise served as the trustee of the investment. Multinational Strategies was managing the funds. Malone received legal advice from the defendant, Ahrens, regarding the Common Trust Fund. Mr. Malone paid substantial fees to participate in the program, $1.7 million. He was charged $195,000 by HVB, over $850,000 in fees by Enterprise and Multinational Strategies. In 2005, the IRS audited Mr. Malone's 2001 tax return, resulting in a deficiency of $3.6 million, an interest owed of $388,000. In August 2003, the IRS issued Notice 2003-54, which disallowed the Common Trust Fund as a tax shelter. In August 2003, the IRS issued Notice 2003-54, which disallowed the Common Trust Fund as a tax shelter. Yes, he was sued in 2007, but before that happened, and actually in 2005, he was audited. And at the time of the audit, Mr. Malone did not know that he had relied upon a false and misleading documentation provided by the defendants when he entered into the Common Trust Fund. Multinational Strategies continued to represent that the HVB loan was, in fact, in place until at least February 24, 2005. Let me ask you another question about the facts, which I think is of some relevance here. The IRS notice came out in August 2003, and immediately your client got a letter that he would be challenged if you take any more losses. It's almost certain you'd be audited for 2004. Tax options will not help you. Isn't that correct? Yes, Your Honor. And so then he withdraws funds and asks M&S to pay attorney's fees. Yes, I believe that's correct. Okay. Given those facts, I guess we go right to, did the district court err in his conclusion that he was on notice that the CTF transaction lacked economic substance? Well, what was unknown to Mr. Malone, that did not put him on notice of the fraud that had been committed by the defendants acting in the What is the law that applies here? Is it Washington law that applies? Well, I guess that issue's been raised several times in the court below. Well, I guess I'm worried that we're now talking about that again. Because if I use Washington law, then I have a discovery rule that I have to apply. Well, the discovery rule is not what Malone is relying upon. Oh, I understand. But I guess my worry is that when I'm reaching a conclusion then, when your client was on notice, I have to look at what law I apply as to that. And I'm really looking at, is it Washington law? That's what the district court applied. I didn't see any real problem with that by even your client at that point. So I'm trying to decide if I'm still to apply that. Well, I would say Washington law is applicable for some of the defendants and arguably not applicable as to an enterprise which Missouri law may apply. And we've argued that Missouri law has a longer statute of limitations for Was that an argument first made here? I don't know if that was an argument made below or not. It wasn't. Well, I couldn't find it. That's why I asked you. But really, I think what the crux of this issue before the court is on this appeal is whether Judge Lasnik committed error in applying or in finding that the notice, the IRS notice, which was in August 2003, put the plaintiff on notice and started the statute of limitations running as to his fraud claims against the defendants. And we would certainly argue that that's a factual issue that should have been presented to a jury or Are there any questions of fact here? Are the facts pretty well stipulated? I didn't find any question of fact. The facts seem plain and unambiguous on the face of what's in front of me. In those situations, I guess I'm having a tough time why the court shouldn't apply the law. Well, I don't know what law Your Honor is referring to, but statute of limitations. Statute of limitations. Well, the statute of limitations would not apply, would not start running in August of 2003 by the mere fact that the IRS notice 2003 was issued. That notice did not put Mr. Malone on inquiry notice that he had a fraud claim. A loan that was not genuine, a bogus loan, is not mentioned in the IRS notice in 2003. Now, there was in 2007, or 2006. I guess I'm again worried that the cause of action accrues when the plaintiff knew or should have known when he's placed on notice of some appreciable harm occasioned by another's conduct. Yes, Your Honor. That's correct. And the conduct that we're talking about is the fraudulent conduct by the defendants. Clearly, Mr. Malone Is it? I mean, the damages you've cited have much more to do with the inability to get the tax benefits that were supposed to be realized. And in 2003, he learned he wasn't going to get the tax benefits as far as the IRS was concerned. It's not the tax benefits that we're suing on. It's really the investment that he paid, the money that he paid to HVB, that's $195,000 for a loan that did not exist, and management fees of $850,000 to multinational strategies and enterprise trust for funds that were not under management. The loan was a phony loan, and that was not disclosed. He was not put on notice of that fact by the IRS notice in 2003. He was not put on notice of that. In 2003, the transaction lacked economic substance. Isn't that kind of an alarm bell that says something's amiss here? Well, actually, it can be an alarm bell that the tax shelter, the deduction was not The transaction lacks economic substance. The loan is part of that transaction. The only thing I see offered up as missing in 2003 is the specific element that the loan itself may have been a sham. I'm not sure how that changes anything. Why is that such a factor as to tip the balance to put him on notice not until 2007? Well, of course, there have been cases that talk about the notice of the IRS notice not being sufficient to put a taxpayer on notice of a fraudulent transaction. Well, if it lacks economic substance, what do you think could have been set up? It can lack economic substance for a number of reasons. And actually, if you look at the description in the notice, it talks about the offsetting positions entered into by CTF did not have any effect on the CTF's net economic position or non-tax objectives and did not serve any non-tax objectives of the CTF or afford it a reasonable prospect for profit. No mention of the loan being a fraudulent loan. That was not disclosed until 2006, February 2006. Well, as I understand it, there are two types of claims you're making. One has to do with the economic substance, another having to do with the fraud. But I guess as to the economic substance or as to whether this was something you didn't get anything out of, it seems a little tough to suggest that one isn't on notice when he's given attention to it by the IRS. He sent a letter in January saying, withdraw all your funds. He's told to amend his to file amended tax return. And he says, pay my fees. Yes, Mr. Malone does say that. When he says, pay my fees, that seems to be a little more than, well, I don't even have any idea what's going on here. Well, that may be. But he's certainly upset about the fact that he's been notified by the IRS that his tax deduction is going to be disallowed. But also look at what Multinational Strategies does. In 2005 and in 2006, they're sending statements for a loan and interest charges against this investment and for management fees for funds that were not under management. My worry is this. If I've got to this point, I guess I'm having a tough time understanding, should have known. And if I'm placed on notice, then I've got to take, as I understand it under Washington law, further diligent inquiry to ascertain the scope of the harm because your client is charged with what a reasonable inquiry would have discovered. But the conduct that we're talking about is not conduct that the IRS notice would have put Mr. Malone on notice of. I'm not just talking about what the IRS did. I said then he got a letter saying withdraw your cash. Then he asked them to pay his fees. MNS then said file an amended tax return. At that point, I'd have been on notice. I'd have done a little more to find out what the heck's going on here. And then if he is, he is charged as if he had made a reasonable inquiry under Washington law. Well, I think what we're asking the court to do is parse out the failed tax shelter from the fraudulent conduct of the promoters and the bank and those who marketed this investment to Mr. Malone. That was not something that was evident, that fraudulent conduct in the 2003 notice. If I look at the fraudulent conduct, the biggest problem that I have here is that Washington has a different standard of review regarding CENTER than the federal securities law. And I looked all over in Washington to find out what the standard for the Washington cases was, and I couldn't find it, and I didn't really find it addressed in the briefing either. So I'm wondering if it isn't waived, since nobody tells me what the standard for CENTER in Washington is. Well, I don't know how I would articulate the standard of CENTER. I don't either, because I looked at the Washington cases to figure it out, and it's certainly not something that rang clear to me. Well, I think what bears on the issue of CENTER is the deferred prosecution agreement that HVB entered into. That was not until February of 2006, which Mr. Malone did discover, and it was after the February 2006 DPA by HVB that he filed his complaint. And that deferred prosecution agreement does indicate for the first time to Mr. Malone, the first time he's on notice, really, of the fraud is in that DPA, where HVB admitted participating in transactions purporting to be loans that were not bona fide loans, participating in trading activity on instructions from promoters that was intended to create the appearance of investment activity, but that had no real substance. So that was not what the IRS notice put Mr. Malone on notice to. And so that is clearly a factual issue. It's not one that should have been decided on a motion to dismiss by the district court. We had clearly made that argument to Judge Lasnik. It's a factual issue that should be presented to a jury. And if I may, then, I'd like to go on to the next panel. You're actually well over your time, so we'll hear from defendants now. All right. Good morning, Your Honor. I'm Malcolm Harris. I represent what have been called the MNS defendants, MNS Multinational Strategies, Coastal Trading LLC, and Michael and David Schwartz. Before I begin, I just want to tell Your Honor that yesterday I had a serious injury to my eye, and if I appear to be crying today, it's not that I'm crying. So if you see tears dripping off my face, don't be surprised. At least we're not doing it. No, it's not your fault. Okay. Okay. Your Honor, our clients were dismissed in this action with a summary judgment motion at the end of the three-year discovery period. Judge Lasnik had earlier dismissed some of the claims against all the defendants. All of the federal claims were dismissed early on for statute of limitations reasons, using the same 2003 date as the triggering date for the running of the statute of limitations. There was no contest of that at the time, and the court made that determination as to the effective date, and nobody ever questioned that. We believe that the district court did not err in determining that the discovery rule did not pull the applicable statute of limitations, and we believe also that Washington law is the appropriate law to be governed here, and let me discuss that. As Your Honor has indicated in the questions, under Washington law, the courts can infer knowledge of fraud if the aggrieved party through due diligence could have discovered the fraud once he's put it on notice regarding the possible existence of it. And in 2003, August of 2003, the IRS issued its notice indicating that this fund had no substantial economic substance. My client, Mr. Schwartz, immediately advised Mr. Malone of that in a letter and also suggested that he seek legal counsel. And that certainly put him on notice that he was not going to get the tax benefits that he had expected to get, and it triggered on Mr. Malone's part a termination of his investment. And by December of 2003, he had withdrawn all of the funds that had been in the account and had no further financial relationship with my client other than to receive follow-up reports regarding some of the tax issues and the tax statements. Now, the fraud that is being alleged in this case is this issue of a sham loan. And your counsel's presentation and his appeal and your questions so far have dealt with the issues of statutes of limitation. But I submit in focusing on statutes of limitation, he has the cart before the horse. A statute of limitation is considered once you show that you have a claim and then you determine when the statute of limitation runs on that claim or whether it might have been told or extended. First, you have to show that there's a claim. The sham loan claim has also been defeated by Judge Lasnik in his summary judgment order. He concluded at the summary judgment hearing that the plaintiff had not come forth with enough evidence to show that there was such a sham loan claim. And by talking about the statute of limitations, I don't want the court to assume that we believe that there's any merit at all to the sham loan claim. That is the basis upon which all of this claim can be dismissed, if not also on statute of limitations ground. The facts are that he was a very sophisticated investor. At the time he made his investment, he arranged for insurance on the $15 million loan, but then never actually purchased it. In March of 2002, Malone represented to the law firm of Sydney Austin his own counsel in that case who were giving him tax opinions. He represented to them that he had borrowed the $15 million from UVB via Braxton and then had turned around and loaned it to his wholly owned S Corp. Belmar Trading, who made the investment. So here we have Mr. Malone at the commencement of this, in order to get his tax deduction and qualify and get the tax opinion he needed, he's telling his own counsel, who's issuing the tax opinion, that he had made the loan. I think... Well, Clinton, Clarence, Sidley, and Austin was his counsel. They were the ones who issued the tax opinion. Is there any evidence that they were actually his counsel? Well, they were... How about Ahern was his counsel? They were his counsel for purposes of issuing a tax opinion upon which he was going to rely in his qualification for this investment. They were not generally his counsel, I agree, but for this purpose they certainly were. He also arranged in February of 2003 for the loan to be converted from a recourse loan to a non-recourse loan, and you have in the record here the agreement that he signed with Braxton to make that conversion of the loan. He also arranged for liquidation of his coastal funds investment by December of 2003, and certainly at that time that would have been an appropriate time for him to find out if there were, in fact, a sham loan or a real loan. There's other evidence to show the existence of the loan. In April 2008, Mr. John Gallagher, a managing director of HVB New York, filed a declaration in this action in which... I hope you read from that, in which he stated, On or about November 2001, Michael Malone, Belmar Trading and Belmar Investment, opened accounts with HVB New York, which were maintained in New York. Pursuant to a loan agreement dated December 3, 2001, HVB Finance made a loan to Braxton Management, Inc. The loan was made in New York, and this is the loan that then went on to Mr. Malone and then to Belmar. So here we have testimony from HVB that they made the loan. My client, Michael Schwartz, gave a declaration indicating that he'd had a few conversations with HVB when they called him in order to get details regarding the investment for booking the loan. So, Your Honor, we have substantial evidence that there was a loan, and we have no evidence that there was not a loan other than the allegations of counsel. And the only evidence they put before the court, which I believe is not admissible at all, is the fact that in another litigation involving parties unrelated to this case, involving investment programs unrelated to this case, that HVB admitted that it had made sham loans in those cases. But there's no evidence that the loan in this case was ever a sham. That was Judge Lasnik's conclusion. On the last page of his opinion, on the summary judgment motion, he said, accordingly, their request for continuance is denied, and their breach of contract claim fails as unsupported. And that's after discussing all of these facts that are just related to you. So getting on to the discussion of statutes of limitation, I think, is really unnecessary, because there was no such claim from which the statute of limitations might have been running or might have been told or might have been continued. Now. So what you're suggesting is there is no question of fact as to that particular issue. That's what Judge Lasnik concluded, and I think that his opinion is thoroughly supported by the evidence. And remember, Your Honor, that the summary judgment motion we brought was not premature. We brought our summary judgment motion a week before the court's final deadline for bringing such motions, after almost three years of opportunity to do discovery. Plaintiffs did not take any depositions in this case, not one. Twenty-five parties in this case at the commencement of it. No depositions were taken. The only discovery they did with respect to the loan issue, the question of the sham loan, was to serve a huge document request and discovery request and subpoena upon HVB, which was largely unrelated to the issues of this case. I don't know why they did that. All they had to do would have been to subpoena the loan officer at HVB and tell him to bring the loan file to a deposition and to show that a loan had been made. That's all they had to do to prove whether or not there was a loan. But the document request that they propounded to HVB was so onerous, so overbearing, that the Southern District of New York court quashed it and invited them to come back with a more reasonable discovery request, which they never did. And several months later, on the very eve of these motions, they sent out the same or virtually the same discovery request to HVB again. And again, it was ignored, and as I understand, it was also dismissed. I understand that the Second Circuit has recently dismissed all of the claims against HVB, but I'll let HVB's counsel talk about that. So, Your Honor, even if there were a sham loan, we believe that there is abundant evidence that the statute of limitation has run. And the various theories that counsel has raised here for the first time on appeal should not be considered by the court. First is this Washington law versus Missouri law issue. This was never discussed at any time below in any of the motions, in any of the pleadings, in any of the complaints. They cannot raise this for the first time in an appeal at the circuit court. They have not shown that any of the three exceptions to bringing issues at the appellate court level apply. None of those have been pled or argued about. And it's also inconsistent with Mr. Malone's position throughout the entire case. Mr. Malone has consistently argued throughout this case that Washington law applies. Several clients, including my client, have challenged that issue before. We argued at one point that New York law might apply because there was a provision for New York law to apply in the subscription agreement, and we wanted to do that because the Martin Act of New York would have thrown this whole claim out. So we made that attempt, and they vigorously argued against that and said, no, Washington law applies under a similar choice of law provision in a contract. So I think that their position is now completely inconsistent. Mr. Harris, you may want to give your co-counsel a little time. Yes. Am I taking my five minutes? Oh, yeah. Well, you've taken 11 minutes. 11 minutes. Oh, my goodness. The clock is sitting in front of you. I'm sorry. Time does run thin. Thank you, Your Honor. If you have any further questions, I'll be happy to answer them. Good morning, Your Honors. I'm Greg Holland from McNall-Eville. I represent the law firm of Ahrens & D'Angeli and Ed Ahrens. Given the amount of time left, I'll try and be extremely brief  I think it is useful to conceive of basically two damages and two claims, separating the two claims as Judge Smith referenced earlier. There's the damages that arise from the failed tax shelter, and then there's the damages that allegedly arise from this fraud, the sham loan, when, in fact, as Mr. Harris pointed out, there was no sham loan. With respect to Ahrens & D'Angeli, what Mr. Wilson didn't tell you when he referenced fees that were incurred by his client was that his client paid a grand total of a little over $3,700 to Ahrens & D'Angeli, who was simply a lawyer that looked at the transactional documents in 2001 and then gave an additional eight hours of advice in 2004 with respect to the upcoming IRS audit. My client was in no way involved in the fraud. There were no particularized allegations that Ahrens & D'Angeli was involved in any fraud. And with respect to the sham loan allegations, even assuming there were a sham loan, there's several fatal problems with that theory as it relates to Ahrens & D'Angeli. First, of course, the law firm had no connection to the loan at all. Second, the loan added, with respect to Ahrens & D'Angeli, as the district court found, the loan added nothing to the allegations against the law firm. If it was a sham loan, the transaction lacked economic substance, and the allegations against the law firm were that it had failed to identify the problems with economic substance. The plaintiff was clearly on notice of those claims in 2003. And finally, and I think perhaps most problematically, the court found on summary judgment that there was no sham loan, that in fact a loan was made. So again, with respect to Ahrens & D'Angeli, my client, who was truly a bit player in this saga, any claims that the client could have had against Ahrens & D'Angeli, they were clearly on notice of in 2003, and they blew the statute of limitations. I'm going to leave what time remains for my co-counsel. Your Honors, may it please the Court, my name is Trevor Welch. I represent the appellee HVB, and we have a single, simple issue. The claims against HVB were dismissed pursuant to a form selection clause, which required the appellant to file its claims in New York. The court declined to transfer them. The appellant's focus on the fact that, by declining to transfer them, their claims are effectively time barred. I want to focus the court on the relevant inquiry. The appellants want the court to focus on the prejudice, but that's not the relevant inquiry, or at least it's not the end of the inquiry. The relevant question is, for what plausible reason did the appellants legitimately believe their claims were properly venued in Washington? There's no plausible reason. They've never offered a plausible reason, and as a result, it's not in the interest of justice to transfer their claims and salvage their claims in the face of their own deliberate disregard of the form selection clause at worst, or at best, failure to do basic due diligence and review the contract on which their claims against HVB are based. Thank you. Good morning. Jeffrey Knutson for Enterprise Bank, and at this point, I'd like to just focus the court. I think the argument, Enterprise was dismissed for lack of personal jurisdiction. The argument, in essence, is that Judge Lasnik applied some sort of heightened standard. He applied well-settled Ninth Circuit law that provides that the court does not have to accept legal conclusions, indicating to the plaintiffs ample opportunity to plead the elements of agency for which they were trying to establish purposeful availment by Enterprise, who does no business in the state of Washington. And the other well-settled law in Ninth Circuit is that you don't have to accept the bare allegations of the complaint in the face of contrary evidence. The other issue was the reconsideration on the issue of personal jurisdiction. I think Judge Lasnik went through that very carefully. Basically, he said that the contrary Malone affidavit that finally appeared after the Third Amendment complaint well over a year into this case, they'd had ample opportunity to submit that earlier, hadn't submitted it, and in any event, it still would not solve their pleading problems of pleading the essential elements of agency for purposes of jurisdiction, not having pled mutual assent. They were claiming that MNS was your agent, right, that Enterprise's agent, and that connected them to Washington at different points in time. They claimed that Clark Neuber was our agent. Then they claimed Coastal, I think, primarily. But since we grouped Coastal with MNS, I guess that's MNS. But in essence, what Judge Lasnik said is, you know, under Washington law, you have to plead at least the facts that would establish the elements of such an agency, which would be mutual assent and control. And having been given the opportunity to do that, they failed to do it. Thank you. Mr. Wilson, I'll give you a minute. Thank you. I just want to address Judge Smith. You were asking about Sienter. And it's interesting that Mr. Harris's argument that there is we put the cart before the horse, asking not making our claim particularized enough as to the fraud committed by HVB. Well, you know, how could we be accused of being on notice of the 2003 notice of fraud when Mr. Harris is making the argument that there's no evidence of the fraud? Well, the evidence is in HVB's own DPA, where they admit that the loan was bogus. I just want to address myself. Did they admit that this loan was bogus or just that there were other tax shelters where the loan was bogus? They referenced the Common Trust Fund, 23 Common Trust Funds. Now, HVB was dismissed, so we didn't really have an opportunity to conduct discovery as to HVB. We did issue a subpoena. It's correct that it was quashed. We tried it again, and then time ran out before the motion for summary judgment dismissed the whole case. But HVB should not have been dismissed in the first place. Some years after the case was filed. I mean, the motion for summary judgment was last year, less than a year ago. So it's not like there wasn't time to pursue these questions. Well, there is a difficulty when the HVB was dismissed. We had to go to New York. We had to try to subpoena them there. We had to go to New York for the motion to quash. Multinational strategies, we couldn't conduct a discovery on that issue as to multinational strategies. We had to do it against HVB, and HVB had been dismissed improperly. More than two years passed between their dismissal and the summary judgment order. Most lawsuits get wound up within a time shorter than that. Well, Your Honor, that's granted. But really, that doesn't go to the issue of whether the dismissal of HVB was an error or not. And had HVB stayed in the case. You elected not to talk about that during your 15 minutes, and we're not going to have you get into it now. Okay, well, it was just for rebuttal. But it's in our brief. Thank you, Your Honor. Thank you. Case just argued is submitted. That concludes our calendar for today, and we're adjourned.
judges: Gilman (6th Cir.), Clifton, Nr Smith, Cjj